**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

JOSHUA ESPINAL,

  Plaintiff,

vs.            CASE NO.:

BIG TEN MANAGEMENT LLC
Florida Limited Liability Company  INJUNCTIVE RELIEF SOUGHT
d/b/a GLITCH BAR

  Defendant(s).

## <u>COMPLAINT</u>

Plaintiff, JOSHUA ESPINAL (hereinafter "ESPINAL"), by and through the undersigned counsel, hereby files this Complaint and sues BIG TEN MANAGEMENT LLC, Florida Limited Liability Company, d/b/a  GLITCH BAR ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1.  This action arises from Defendant's failure to make Defendant's online platform located at www.glitchbar.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including ESPINAL, full and equal access to Defendant's products and services.

2.     ESPINAL files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Defendant's products and services.

3.     Accordingly, ESPINAL seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4.     This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA.  *See also,* 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5.     Venue is proper in this Court, Fort Lauderdale Division Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court For the Southern District of Florida in that a substantial part of the acts and omissions giving rise to ESPINAL's claims occurred in Broward County, Florida.

6.     Defendant attempts to, and indeed does, participate in Broward County's economic life by offering and providing products and services over the internet to Broward County's residents, but also extends its services to other residents within the state of Florida through its online presence, including ESPINAL, who is a resident of Flagler County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 905 NE 5th Ave, Fort Lauderdale, Florida 33304 (hereinafter "Defendant's Principal Place of Business"), which is located in Broward County, Florida.

8. ESPINAL was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9. ESPINAL is a natural person over the age of 18 and is blind.

10. ESPINAL is *sui juris* and is a resident of the State of Florida residing in Palm Coast, Florida, located in Flagler County.

11. ESPINAL is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, ESPINAL is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, ESPINAL uses screen access software to access digital content, like text messages, emails, and websites.

12. ESPINAL cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software

reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13.     ESPINAL's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14.     ESPINAL frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, ESPINAL uses commercially available screen reader software to interface with the various websites.

15.     Defendant is Florida Limited Liability Company with a Principal Place of Business of 905 NE 5th Ave, Fort Lauderdale, Florida 33304  (hereinafter "Defendant's Principal Place of Business").

16.     Defendant's Website promotes and provides information regarding Defendant, which is an entertainment venue offering retro and modern arcade games, food, and alcoholic beverages. Defendant's Website includes various sections such as information about available games, menu offerings, special events, photo galleries, and general venue details. Defendant's

4

Website is designed with numerous images, navigation links, and promotional content intended to inform potential patrons about Defendant's services, hours of operation, and amenities, and to encourage in-person visits to Defendant's Principal Place of Business. In order to access, research, or purchase Defendant's products and services, consumers may visit Defendant's online store located at Defendant's Website.

17.     Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18.     Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and it's implementing regulation as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as "place of public accommodation".

19.     There is a clear nexus between Defendant's Website and Defendant's Principal Place of Business, as Defendant's Website is intended to promote, market, and facilitate access to the goods and services offered at Defendant's Principal Place of Business. Specifically, Defendant's Website provides information regarding Defendant's arcade games, food and beverage offerings, hours of operation, special events, and other amenities available at Defendant's Principal Place of Business and encourages patrons to visit in person. By directing users to Defendant's Principal Place of Business and advertising the in-person experiences available there, Defendant's Website serves as a gateway to Defendant's Principal Place of Business and is closely integrated with the services provided at Defendant's Principal Place of Business.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both at Defendant's Website and in Defendant's Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21. ESPINAL is and has been a customer who is interested in patronizing and intends to patronize in the near future once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22. There is a direct nexus between Defendant's Website and Defendant's Principal Place of Business, as Defendant's Website functions as a primary means of promoting and providing information about the goods and services offered at Defendant's Principal Place of Business. Defendant's Website describes Defendant's arcade offerings, food and beverage menu, events, hours of operation, and other features that are only available at Defendant's Principal Place of Business. By advertising in-person experiences, providing directions and contact information, and encouraging patronage of Defendant's Principal Place of Business, Defendant's Website is fully integrated with and facilitates access to the services of Defendant's Principal Place of Business.

23. Defendants' Website is additionally used to search for brick-and-mortar locations, check Defendant's hours and offerings, pricing, purchasing, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to search, navigate, and obtain information about Defendant's goods and services through Defendant's Website, including reviewing offerings, hours, events, and other features available at Defendant's Principal Place of Business, as well as signing up for electronic communications to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Principal Place of Business from his home, are important accommodations for ESPINAL because traveling outside of his home as a visually disabled individual is often difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

25. Like many consumers, ESPINAL accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. ESPINAL may view several dozen websites to compare features, discounts, promotions, and prices.

26. ESPINAL utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, ESPINAL attempted to utilize Defendant's Website:

a.        March 25, 2026; and

b.        April 03, 2026.

(hereinafter "ESPINAL's Website Visits"). During ESPINAL's Website Visits, ESPINAL experienced substantial access barriers and, thus, was denied fair and equal access to same. ESPINAL was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28.        While notice to Defendant is not required, ESPINAL sent a pre-suit communication on April 3, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29.        Prior to initiating suit, but following the sending of the pre-suit communications, ESPINAL has continued to attempt to utilize Defendant's Website during ESPINAL's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30.        However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31.        ESPINAL adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32.        On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from

8

the enactment of the statute to implement its requirements.  The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts

the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 .S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No.

37.     More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

38.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled." [6]

39.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40.     Consistent with these policies, ESPINAL files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

---

101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[2] 42 U.S.C. § 12188(b).

[3] 42 U.S.C. § 12188(a).

[4] Johnson, *supra* note 8.

[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

11

41.	Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42.	There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides the contact information, operating hours, and access to products found at Defendant's Principal Place of Business and address to Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business, providing users with the ability to search for and review Defendant's goods and services, including arcade offerings, food and beverage options, and events available at Defendant's Principal Place of Business, as well as obtain directions to and contact Defendant's Principal Place of Business, review operating hours for Defendant's Principal Place of Business, and plan visits to Defendant's Principal Place of Business, all of which are directly tied to and intended to facilitate access to Defendant's Principal Place of Business.

43.	Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44.	The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45.	Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47.     Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48.     According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49.     Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary

13

aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. ESPINAL, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50.      ESPINAL encountered barriers on each of ESPINAL's Website Visits. ESPINAL attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with ESPINAL's screen reader software. Specifically, features of Defendant's Website are inaccessible to ESPINAL's screen reader software, including, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

### a.      Logo Alternative Text Incorrectly Defined Using Title Attribute

i. **Issue:** The logo image relies on the title attribute to convey alternative text rather than the required alt attribute. This constitutes a significant accessibility barrier, as screen readers do not reliably interpret the title attribute as a substitute for alternative text. Consequently, screen reader users cannot consistently identify the purpose or meaning of

the logo, resulting in missing or inconsistent information —
particularly where the logo serves a branding function or operates as a
navigational link to the homepage.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind or have visual disabilities and rely
on screen readers, the absence of a properly defined alt attribute on
the logo means they may receive no meaningful information about the
image whatsoever. Because screen readers inconsistently expose the
title attribute, blind users navigating the page may encounter the logo
as an unlabeled or anonymous element, leaving them unable to
identify the brand or recognize that the logo functions as a link. This
creates a disorienting and inequitable experience, particularly when
the logo is the primary means of returning to the homepage. The
expected behavior requires that the logo image include a meaningful
alt attribute that clearly conveys the brand identity or functional
purpose of the image. The title attribute must not serve as a
replacement for alternative text; if supplementary advisory
information is warranted, the title attribute may be used in

15

conjunction with — but never in place of — the alt attribute, ensuring that all users receive consistent, reliable, and meaningful information.

**b.  Social Media Icons Use Title Attribute for Accessible Name**

i. **Issue:** The social media icons rely on the title attribute as their sole source of an accessible name rather than employing established and reliable labeling methods. This constitutes an accessibility barrier because screen readers do not consistently announce the title attribute, particularly when an element receives keyboard focus. As a result, users who depend on assistive technologies are unable to reliably determine the purpose of these icons or identify which social media platform each icon represents, leading to missing or inconsistent information and a materially reduced level of usability.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind or have visual disabilities and navigate using screen readers, social media icons that lack a reliable accessible name are effectively anonymous interactive elements. When a screen reader fails to announce the title attribute — as

16

frequently occurs, particularly on focus — a blind user has no means of determining whether a given icon links to Facebook, Twitter, Instagram, or any other platform. This forces blind users to activate links without understanding their destination, undermining informed navigation and creating an experience that is fundamentally unequal to that of sighted users. The expected behavior requires that social media icons be assigned a clear and consistently exposed accessible name through accepted methods such as visible text, aria-label, or aria-labelledby. The title attribute must not serve as the sole source of an accessible name, as its announcement behavior is unreliable across assistive technologies. Implementing proper labeling ensures that all users, including those who are blind, can confidently identify and interact with social media links.

c.     **Social Media Links Open in New Window Without Programmatic Indication**

i. **Issue:** The social media links are configured to open in a new browser window or tab; however, this change in context is not communicated programmatically to assistive technologies. This constitutes an accessibility barrier because screen reader users receive no advance notification that activating a link will result in a new window opening. Consequently, users are unable to anticipate the change in context prior to activation, which disrupts navigation flow and makes it significantly more difficult to return to the originating page. The

absence of any clear programmatic indication produces an unexpected and inconsistent user experience.



ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, unexpectedly having a new browser window open without prior warning creates significant disorientation and navigational confusion. Blind users depend entirely on programmatic cues to understand their browsing context; when a new window opens without announcement, they may lose their place within the page, be unaware that a new window has been launched, and struggle to return to the original content. This lack of transparency constitutes a material barrier to independent and confident navigation. The expected behavior requires that social media links which open in a new window or tab communicate this behavior both visually and programmatically. This may be achieved by incorporating descriptive text within the link or by using an aria-label that includes language such as 'opens in a new window.' Furthermore, the target='_blank' attribute should be

18

accompanied by rel='noopener noreferrer' for security purposes. These measures ensure that all users, including those who are blind, are informed of the anticipated behavior before activating a link and can navigate without encountering unexpected or disorienting context changes.

**d.     H1 Heading Incorrectly Placed at End of Main Content**

i.  **Issue:** The <h1> heading 'Get Directions to Glitch Bar & Arcade' is positioned at the end of the main content area rather than at its beginning. This constitutes an accessibility barrier because screen reader users rely on the primary page heading to appear early in the content in order to establish context and understand the purpose of the page. As a result, users navigating with assistive technologies encounter the main heading too late, making it impossible to quickly orient themselves to the page's subject matter. This incorrect placement disrupts the logical structure of the content and significantly reduces navigational clarity.



ii.  **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or have visual disabilities and navigate by headings using a screen reader, the misplacement of the <h1> heading at the end of the main content area means they must traverse the entire page before encountering the primary contextual landmark. Blind users frequently use heading navigation as their first point of orientation when arriving on a page; when the <h1> is absent from the beginning of the content, they are deprived of the immediate context necessary to determine whether the page is relevant to their needs. This forces blind users to navigate through potentially lengthy content without understanding its purpose, creating an experience that is both inefficient and inequitable. The expected behavior requires that the <h1> heading be placed at the beginning of the main content area and clearly describe the primary purpose of the page. All subsequent headings should follow in a logical hierarchical order, progressing from <h2> through <h6> as appropriate. Correct heading placement ensures that screen reader users can immediately understand the page context and navigate the content structure effectively and efficiently.

e. **Decorative Images Incorrectly Use Alternative Text**

i. **Issue:** Decorative images present on the page are assigned descriptive alternative text despite the fact that they convey no meaningful information to the user. This constitutes an accessibility barrier because screen reader users are compelled to listen to unnecessary

and irrelevant descriptions that do not contribute to their understanding of the content. Consequently, users are unable to navigate the page efficiently, as these redundant announcements interrupt the natural reading flow and introduce noise into the assistive technology experience. Images that are purely decorative in nature should not be exposed to assistive technologies.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, being subjected to descriptive alternative text for images that carry no informational value creates a frustrating and inefficient experience. Each unnecessary announcement adds to the cognitive load placed on blind users, forces them to process irrelevant content, and interrupts the flow of meaningful information. Over the course of navigating a page with multiple decorative images, these cumulative interruptions can significantly impede a blind user's ability to locate and absorb substantive content in a timely and effective manner. The expected behavior requires that decorative images be implemented with an empty alt attribute — expressed as alt="" — so

that screen readers bypass them entirely. Alternatively, purely visual images may be rendered using CSS background images, which are not exposed to assistive technologies by default. These measures ensure that only content of genuine informational value is announced to users, thereby improving navigational efficiency, reducing unnecessary interruptions, and delivering a more equitable and accessible experience for all users.

**f.      Missing Title Attribute for iFrame**

i.  **Issue:** The <iframe> element present on the page lacks a defined title attribute, creating a significant accessibility barrier for screen reader users who depend on this attribute to understand the purpose and content of the embedded frame. Without a meaningful title, the iframe is announced as generic content by assistive technologies, making it impossible for users to determine its relevance to their current task or decide whether to interact with it.



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or visually impaired and rely on screen readers, the absence of a descriptive title attribute on the <iframe> element renders the embedded content effectively unidentifiable. These users are unable to determine what the iframe contains, whether it is relevant to their task, or whether it warrants interaction. The iframe is announced only as generic content, stripping away the contextual information necessary for meaningful navigation. This results in a fundamentally inaccessible experience, denying blind users equal access to the embedded content that sighted users can perceive at a glance. The <iframe> element should include a descriptive title attribute that clearly explains its purpose or content, ensuring that screen reader users can understand what the iframe represents and make informed decisions about interacting with it. The title should be concise, meaningful, and accurately reflective of the embedded content.

g.     **Carousel Not Programmatically Defined**

i. **Issue:** The carousel component lacks proper programmatic definition through semantic structure or ARIA attributes, creating a significant accessibility barrier for screen reader users. Without appropriate markup, assistive technologies cannot identify the content as a carousel, convey the total number of slides, or communicate which slide is currently active. This absence of structural and state

23

information prevents users from effectively navigating carousel content or perceiving dynamic changes within the component.



ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** For users who are blind or visually impaired and rely on screen readers, the absence of programmatic definition on the carousel component creates a complete barrier to understanding and interacting with its content. These users cannot identify that a carousel exists, determine how many items it contains, or know which slide is currently displayed. Dynamic changes in content go unannounced, leaving blind users without the contextual awareness that sighted users obtain visually. This results in an inequitable experience in which critical content presented within the carousel is entirely inaccessible. The carousel should be implemented with proper accessibility support, including clear labeling such as aria-roledescription="carousel", keyboard-accessible navigation controls, per-slide identification, and state indicators such as aria-live="polite" or aria-current="true" where appropriate, so that all users can navigate and understand the component with full positional awareness.

24

**h.**  **Carousel Not Keyboard Accessible**

i. **Issue:** The carousel component does not support keyboard navigation, preventing users who rely solely on a keyboard from moving between slides or activating carousel controls such as next and previous buttons. This constitutes a significant accessibility barrier, as all interactive functionality within the carousel is rendered unavailable to keyboard-only users and screen reader users alike, resulting in incomplete access to the information and functionality the component provides.



ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Keyboard

iii. **Impact:** For users who are blind and navigate exclusively through keyboard and screen reader interaction, the carousel's lack of keyboard accessibility creates an absolute barrier to its content. These users are entirely unable to move between slides, activate navigation controls, or access any information presented within the carousel. Because blind users cannot use a mouse and depend on keyboard operability to interact with web content, this failure means that all

content within the carousel is effectively hidden from them. This represents a profound inequity in access, as sighted mouse users can freely browse the same content that remains completely out of reach for blind users. The carousel must be fully operable via keyboard, with all controls—including next, previous, pause, and slide selection—being focusable and activatable using standard keys such as Tab, Enter, Space, and arrow keys where appropriate, ensuring equal access for all users.

i. **Auto-Playing Carousel Without Proper Accessible Controls**

i. **Issue:** The carousel automatically advances through slides, and although play and pause controls are present, the auto-rotation functionality is not properly accessible. Users may be unable to easily locate or operate the pause control, making it impossible for screen reader users and keyboard-only users to reliably stop the moving content. Continuous automatic movement impedes users' ability to read or interact with slide content before it changes, resulting in missed information and disrupted focus.



ii. **WCAG 2.1 AA Violations:** 2.2.2 - A - Pause Stop Hide

iii. **Impact:** For users who are blind and rely on screen readers, auto-playing carousels without properly accessible controls present a serious and disorienting barrier. As slides change automatically, screen readers may interrupt ongoing announcements or fail to convey content in full before the next slide appears, causing blind users to miss critical information entirely. The inability to reliably locate and activate a pause control through keyboard interaction means these users cannot stop the motion to read content at their own pace. This creates an experience in which the carousel actively works against the blind user's ability to access information, placing them at a significant disadvantage compared to sighted users who can visually track and absorb content regardless of movement. Auto-playing carousels must provide a clearly visible, keyboard-accessible pause or stop control that is properly labeled for screen readers—for example, "Pause carousel autoplay"—and the carousel must not advance slides while a user is actively interacting with it, ensuring that all users can consume and engage with content without disruption.

j. **Tab Components Not Programmatically Defined**

i. **Issue:** The tab elements, including "Bottle/Can", "Cocktails", and "Food Menu", are not defined programmatically using appropriate semantic roles and structural relationships. This creates a significant

accessibility barrier, as screen reader users cannot identify these elements as tabs, understand their association with corresponding tab panels, determine which tab is currently active, or navigate between them effectively. The absence of proper roles and states prevents assistive technologies from conveying accurate and meaningful information about the tab interface.



ii.  **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.4.3 - A - Tabs

iii.  **Impact:** For users who are blind or visually impaired and rely on screen readers, the absence of programmatic definition on the tab components renders the entire tab interface inaccessible. These users cannot identify that a tabbed navigation structure exists, determine the names or states of individual tabs, or understand which content panel is associated with a given tab. Without this structural information, blind users are unable to navigate between menu categories such as "Bottle/Can", "Cocktails", and "Food Menu", effectively excluding them from accessing the full range of content available to sighted users. This represents a significant barrier to equal participation and information access. Tabs should be implemented using proper ARIA

28

roles—including role="tablist", role="tab", and role="tabpanel"—with each tab incorporating aria-selected to indicate active state and aria-controls to associate it with its corresponding panel. Tab panels must be properly labeled and conditionally shown or hidden based on the active tab, and keyboard interaction using arrow keys, Enter, and Space must be fully supported to ensure equitable access for all users.

k.  **Missing Programmatic Selected State for Tabs**

i. **Issue:** The tab components — including "Bottle/Can", "Cocktails", and "Food Menu" — do not programmatically expose a selected state, preventing screen reader users from identifying which tab is currently active. This absence of a declared active state makes it impossible for users to determine which content is presently displayed on the page, and creates significant difficulty when attempting to navigate between tabs due to the lack of any discernible active tab indication.



ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, the absence of a programmatic selected state on tab

components such as "Bottle/Can", "Cocktails", and "Food Menu" renders tab-based navigation effectively inaccessible. Without the use of aria-selected="true" on the active tab and aria-selected="false" on inactive tabs, screen readers are unable to announce which tab is currently selected, leaving blind users without any means of determining which content is visible on the page. The lack of properly established relationships between tabs and their corresponding panels — through aria-controls and aria-labelledby — further compounds this barrier, as users cannot reliably associate a tab with its displayed content. This failure in state management deprives blind and visually impaired users of the contextual awareness necessary to navigate and interact with tab interfaces effectively, resulting in a fundamentally inaccessible user experience.

51.     Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about March 27, 2026, and who confirmed the access barriers that ESPINAL had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including ESPINAL.

52.     More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

30

53. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make Defendant's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as ESPINAL, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57. Here, however, ESPINAL, through counsel, did send a pre-suit communication informing of the barriers to access on April 3, 2026. As such Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58. As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to its Defendant's Principal Place of Business, Plaintiff has

suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59. Because of the inadequate development and administration of the Defendant's Website, ESPINAL is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60. Enforcement of ESPINAL's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61. ESPINAL has retained the undersigned counsel for the pursuit, filing and prosecution of this action. ESPINAL is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant ESPINAL appropriate and necessary injunctive relief; including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c.   Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, ESPINAL requests entry of judgment in his favor and against Defendant for the following relief:

A.   A declaration that Defendant's Website is in violation of the ADA;

B.   An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C.   An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D.      An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E.      An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F.      An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G.      An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H.      An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.      An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility

34

guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J.      An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K.      An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L.      Such other and further relief as the Court deems just and equitable.

Dated: April 22, 2026                          Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email** : kevin@adalegalteam.com
**Attorney for Plaintiff**